IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CERTAIN UNDERWRITERS AT          )
LLOYD'S, LONDON,                 )
                                 )
              Petitioners,       )
                                 )
        v.                       )      No. 04 C 5852
                                 )
                                 )      Judge Mark Filip
ARGONAUT INSURANCE               )
COMPANY,                         )
                                 )
              Respondent.        )

MEMORANDUM OPINION AND ORDER

Petitioners, Certain Underwriters at Lloyd's, London ("Petitioners" or "Underwriters"),

have petitioned this Court for an order confirming the appointment of Harry Hinkleman and

Stephen Lewis as arbitrators in an arbitration proceeding instituted by Respondent, Argonaut

Insurance Company ("Respondent" or "Argonaut"). (D.E. 1 ("Petition").)[1] The case is before

the Court on the parties' cross-motions for summary judgment. (D.E. 19; D.E. 25). For the

reasons stated below, the Court grants Underwriters' summary judgment motion and denies

Argonaut's summary judgment motion.

---

[1]    The designation "D.E." refers to the docket entry number of the cited document.

Petitioners are a group of underwriting syndicates, whose participants include citizens of the United Kingdom. (Petition ¶ 1; D.E. 29 ¶ 1.) The Court obtained jurisdiction over the Petition by virtue of Chapter 2 of the Federal Arbitration Act, which implements the United Nations' Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). *See* 9 U.S.C. § 203. That federal statute (*i.e.*, 9 U.S.C. § 203) establishes that, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." *Id.* It further provides that, "[t]he district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."); *see also* D.E. 26 ¶ 3 (parties' agreement concerning the statute under which they are litigating).

Between 1959 and 1973, Underwriters subscribed to reinsurance contracts, or "Treaties," with Argonaut. (Petition ¶ 6; D.E. 26 ¶ 6.) Argonaut is an insurance company with its principal place of business in Menlo Park, California, although it also operates from two offices in Illinois. (*Id.* ¶ 2.)

The treaties executed by the Parties contain an arbitration clause that brings the agreements within the Convention. *See* 9 U.S.C. §§ 202, 203. The arbitration clauses state, in

---

[2] The Court takes the relevant facts from the parties' factual submissions, including: D.E. 22, D.E. 26, D.E. 28, and D.E. 29. There is very little disagreement over the facts here, but to the extent there is any, the Court, as it must, resolves genuine factual ambiguities in the respective non-movant's favor. *See, e.g., Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004). Where a party has offered a legal conclusion without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583.

relevant part:

> If any dispute shall arise between the Company and the Underwriters with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, this dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after the receipt of written notice from the other party requesting it do so, the requesting party may nominate two arbitrators, who shall choose the third.

(D.E. 26 ¶ 9; D.E. 21-3 at 1.) The dispute here relates solely to the proper interpretation of two words contained in this clause: namely, "thirty days."

The dispute stems from a settlement between Argonaut and Western MacArthur, one of Argonaut's insureds. (D.E. 26 ¶ 5.) Pursuant to that settlement, Argonaut made payments to Western MacArthur. (*Id.*) Argonaut then sought to recover some portion of those payments from Underwriters pursuant to the Treaties. (*Id.* ¶ 6.) After receiving Argonaut's request for reimbursement, Underwriters requested supporting information and the opportunity to inspect Argonaut's claim files relating to Western MacArthur. (*Id.* ¶ 7.)

Instead of providing the requested information, Argonaut chose to invoke the arbitration provision of the Treaties. (*Id.* ¶ 8.) Argonaut issued a demand for arbitration via a facsimile to Underwriters dated August 4, 2004. (*Id.*) For whatever reason, Argonaut did not designate an arbitrator with its arbitration demand. (*Id.* ¶ 10.) Argonaut instead demanded that Underwriters designate the first arbitrator within thirty days, noting that the last day for designation, according to Argonaut's calculation, would be September 3, 2004. (*Id.*) Two days later, on August 6, 2004, Underwriters similarly requested, via a letter faxed to Argonaut's counsel, that Argonaut designate the second arbitrator within thirty days. (*Id.* ¶ 11.)

On September 3, 2004, Underwriters timely responded to Argonaut's request that they

3

designate the first arbitrator by notifying Argonaut's counsel, via facsimile, that they were appointing Harry Hinkleman as an arbitrator. (*Id.* ¶ 12.) There is no dispute that Mr. Hinkleman was validly designated. (*Id.*)

Unlike Underwriters' timely designation of the first arbitrator, however, Argonaut did not timely respond to Underwriters' request to name the second arbitrator within thirty calendar days. (*Id.* ¶ 13.) When Underwriters did not receive a designation from Argonaut on Sunday, September 5, 2005, thirty calendar days after Underwriters had requested the designation (and not counting August 6, 2004, the date of designation), Underwriters faxed a letter to Argonaut's counsel. (*Id.* ¶ 14.) This letter, sent on Monday, September 6, 2004, stated that because Argonaut had failed to appoint the second arbitrator as demanded under the arbitration clause in the Treaties, Underwriters were appointing Steven Lewis as the second arbitrator pursuant to that arbitration clause. (*Id.*) The parties agree that this letter from Underwriters to Argonaut was sent the thirty-first day after Underwriters demanded that Argonaut appoint an arbitrator within thirty days. (*Id.*)

The next day, September 7, 2004, Argonaut's counsel sent an email to Reinsurers' counsel and alleged that Argonaut had previously sent by mail a letter, dated "Thursday, September 3, 2004,"[3] appointing Paul Thomson as Argonaut's designated arbitrator. (*Id.* ¶ 15.) Argonaut further asserted in its email that Reinsurers' appointment of Mr. Lewis was "void." (*Id.*)

On September 7, 2004, after being advised by Reinsurers' counsel that Argonaut's

---

[3]  Read most charitably to Argonaut, this date was a typographical error, as September 3, 2004 was a Friday, not a Thursday. *See generally* Fed. R. Evid. 201(b).

4

purported letter had not arrived, Argonaut's counsel faxed a letter to Reinsurers' counsel retracting the prior email. (*Id.* ¶ 16.) In this September 7, 2004 letter, Argonaut's counsel acknowledged that the purported letter of September 3rd had not been mailed and further claimed, for the first time, that Argonaut was not bound by the arbitration clause's thirty-day provision because the thirtieth day from August 6, 2004 fell on a Sunday and the next day was the Labor Day Holiday (*id.* ¶ 17)—at least in the United States, if not in the United Kingdom, where Reinsurers are located. (*See* D.E. 20 at 5 n.3.) In the September 7, 2004 letter, Argonaut asserted that its appointment was not untimely and that Mr. Thomson was its appointed arbitrator. (D.E. 28 ¶ 5.)

The parties disagree about whether Steven Lewis or Paul Thomson was appropriately designated as the second arbitrator. After the rejection of a motion to dismiss filed by Argonaut (*see* D.E. 9 (denying motion)), the parties filed cross-motions for summary judgment. In their motion for summary judgment, Underwriters request that the Court confirm the appointment of Mr. Lewis and Mr. Hinkleman as arbitrators in this case. (D.E. 19 ¶ 2; D.E. 20 at 10.) Conversely, in its cross-motion, Argonaut requests that the Court find that its appointment of Mr. Thomson was timely and valid, and seeks an additional finding that Underwriters' appointment of Mr. Lewis is invalid. (D.E. 25-1 ¶ 1). For the reasons stated below, the Court grants Underwriters' summary judgment motion and respectfully denies Argonaut's summary judgment motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

In this case, the parties agree on a great deal. They agree, for example, on the material facts, and they agree that the Treaties contain an arbitration clause applicable to their dispute. (D.E. 26 at 3.) They agree that Argonaut validly initiated an arbitration and that Underwriters validly appointed Mr. Hinkleman as one of the arbitrators. (*Id.* at 4.) Moreover, the parties agree that Underwriters sent Argonaut a letter on August 6, 2004 requesting that Argonaut appoint an arbitrator within 30 days of that date. (*Id.* at 4.) They similarly agree that Underwriters attempted to appoint an arbitrator on September 6, 2004 (*id.* at 5) and that Argonaut responded by attempting to appoint an arbitrator on September 7, 2004. (D.E. 28 at 2.) They also agree that Argonaut did not appoint any arbitrator within 30 calendar days of the demand that it do so. (*E.g.*, D.E. 26 ¶¶ 14, 17).

The parties disagree as to which law applies—state law or federal law—and they also

6

obviously disagree about who should prevail. The parties' basic threshold legal disagreement regards the law that applies to the Treaties' arbitration clause. Underwriters claim that "federal law governs the issue," (D.E. 27 at 4) while Argonaut argues that "California or Illinois state law ... should be applied to the arbitrator appointment provisions." (D.E. 30 at 5.) As the analysis below explains, the application of federal precedent leads to a finding that Argonaut was not timely in appointing Mr. Thomson as an arbitrator. In addition, if state law applies, the applicable state law is that of California and the same result would obtain. In sum, if the Court were required to rule on whether state or federal law governed the question at hand, the Court would find that federal law applies; however the Court need not decide whether federal law or state law (*i.e.*, California law) is applicable, as the same result is reached in either event. *Accord Victrix Steamship Co., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (Newman, J.).

Title 9 of the United States Code, entitled "Arbitration," consists of three chapters: (1) General provisions, (2) Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and (3) Inter-American Convention on International Commercial Arbitration. *See Baker & McKenzie v. Wilson*, No 02 C 4100, 2002 WL 31056688, *1 (N.D. Ill. Sept. 13, 2002) (Kocoras, J.). As discussed above, Chapter 2 implements the Convention, 330 U.N. Treaty Ser. 38, 3 U.S.T. 2517, T.I.A.S. No. 6997. *Id.* As Judge Kocoras explained in *Baker*, although Chapter 2 is part of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, some federal courts have used the term "Federal Arbitration Act" to encompass only Chapter 1 of Title 9. *See, e.g., Int'l Ins. Co. v. Caja Nacional De Ahorro Y Seguro*, 293 F.3d 392, 395-96 (7th Cir. 2002) (stating that although the FAA could not be a basis for subject matter jurisdiction, the Panama

7

Convention, which is codified at 9 U.S.C. § 301 *et seq.*, and which incorporated 9 U.S.C. § 203, provided a jurisdictional basis).[4] Other opinions have used the term "Federal Arbitration Act" to also encompass Chapter 2. *See, e.g., Jain v. Mere,* 51 F.3d 686, 688-89 (7th Cir. 1995) (referring to Convention-implementing legislation as "Chapter 2" of the FAA).[5] For the purposes of this opinion, the Court will follow Chief Judge Kocoras's practice of using "FAA" as the Seventh Circuit did in its most recent exposition on the subject, and the term "FAA" will be used to refer only to Chapter 1 of Title 9; the term "Convention" will be used to refer to Chapter 2 of Title 9. *See Baker,* 2002 WL 31056688, at *1; *accord Bautista v. Star Cruises,* 396 F.3d 1289, 1292 n. 2 (11th Cir. 2005).

The distinction between the FAA and the Convention is important to Underwriters' argument that federal law applies to the interpretation of the arbitration clauses at issue here. One of the ways in which Underwriters attempt to thwart Argonaut's claim that state law should apply is by claiming that, although there is precedent recognizing that state law applies to interpret arbitration provisions subject to the FAA, this same precedent is not applicable to the interpretation of arbitration provisions subject to the Convention, which provides an independent federal jurisdictional basis and which further provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. (*See* D.E. 27 at 5-8.)

---

[4] *See also Daihatsu Motor Co., Ltd. v. Terrain Vehicles, Inc.,* 13 F.3d 196, 198 (7th Cir.1993) (stating that the Convention was incorporated into "Chapter 2 of Title 9" and that "Chapter 1 is the Federal Arbitration Act," citing it as §§ 1-16); *Beiser v. Weyler, et. al,* 284 F.3d 665, 666 (5th Cir. 2002) (discussing Convention separately and delineating the FAA as §§ 1-16).

[5] *See also Republic of Nicaragua v. Standard Fruit Co. v. Standard Fruit Co.,* 937 F.2d 469, 478 n. 13 (9th Cir. 1991) (explaining that the Convention was enacted as part of the FAA).

8

In response, Argonaut cites *Stone v. Doerge*, 328 F.3d 343 (7th Cir. 2003), as support for its contention that state law applies to the FAA. In *Stone*, the Seventh Circuit instructed - in a dispute involving two domestic parties regarding the scope and meaning of an arbitration clause subject to the FAA—that "most interpretive disputes must be resolved under state law." *Id.* at 345; *see also id.* (explaining that, "it is settled that federal courts have jurisdiction over suits seeking to compel arbitration . . . only if the parties are of diverse citizenship, or some other grant of jurisdiction other than [28 U.S.C.] §1331 [the federal diversity of citizenship jurisdictional statute] applies.") (citation omitted). Underwriters argue, however, that the case *sub judice* is not like "most interpretive disputes" because it does not arise under the FAA, but under the Convention. Unlike a case arising under the FAA, "[a] case covered by the Convention confers federal subject matter jurisdiction upon a district court because such a case is 'deemed to arise under the laws and treaties of the United States.'" *Bautista*, 396 F.3d at 1294 (quoting 9 U.S.C. § 203); *accord, e.g., Caja Nacional*, 293 F.3d at 396; *Acosta v. Master Maintenance Construction, Inc.*, 52 F. Supp. 2d 699, 710 (M.D. La. 1999) ("[U]nder 9 U.S.C. § 203, federal courts clearly have original jurisdiction over the entirety of any action which falls under the Convention."). Therefore, Underwriters contend that the concern voiced by the Seventh Circuit in *Stone*---that if "federal common law" were applicable to arbitration clauses subject to the FAA, then "any demand for arbitration would arise under federal law"—is inapplicable here.[6]

---

[6] The Seventh Circuit explained that, for this reason, federal common law must not apply to interpretation of arbitration agreements under the FAA because "it is settled that federal courts have jurisdiction over suits seeking to compel arbitration (or enforce awards) only if the parties are of diverse citizenship, or some grant of jurisdiction other than [28 U.S.C.] § 1331 applies." *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003) (citing *Minor v. Prudential Sec., Inc.*, 94 F.3d 1103, 1104-05 (7th Cir. 1996)).

9

(D.E. 27 at 6, citing *Stone*, 328 F.3d at 345.)

Rather than applying state law to arbitration clauses subject to the Convention,

Underwriters argue that the Court should interpret such clauses in accordance with what the

Supreme Court has recognized as one of the Convention's goals: "to unify the standards by

which agreements to arbitrate are observed and arbitral awards are enforced." (D.E. 27 at 4

(citing, *inter alia, Scherck v. Alberto-Culver Co.*, 417 U.S. 506, 520 (1974)).) In *Scherck*, the

Supreme Court taught that

> The goal of the Convention, and the principal purpose underlying American adoption and
> implementation of it, was to encourage the recognition and enforcement of commercial
> arbitration agreements in international contracts and to unify the standards by which
> agreements to arbitrate are observed . . . .

*Id.* at 520 n.15 (citing, *inter alia*, the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards, S. Exec. Doc. E, 90th Cong., 2d Sess. (1968)). This recognition—*i.e.*, of

Congress's goal through the Convention of unifying the standards by which international

agreements to arbitrate are observed—has been echoed in other federal cases. *See, e.g.*,

*McDermott Int'l, Inc. v. Lloyd's Underwriters of London*, 944 F.2d 1199, 1212 (5th Cir. 1991)

(stating that Congress "sought unity by channeling Convention Act cases into federal courts");

*Acosta*, 52 F.Supp.2d at 708 ("It is self-evident that the courts of the fifty states of this Union are

unlikely to develop a uniform body of federal law regarding international arbitration

agreements."); *see also Intergen N.V. v. Grina* 344 F.3d 134, (1st Cir. 2003) ("[T]he driving

force behind Congress's enactment of Chapter 2 . . . was to set out uniform rules governing the

recognition and enforcement of international arbitration awards. Applying varying state

standards in cases falling within the Convention's ambit would be in tension with the elemental

10

purpose of Chapter 2."); *I.T.A.D. Associates, Inc. v. Podar Bros.*, 636 F.2d 75, 77 (4th Cir. 1981) (stating that Convention interpretation "must not only observe the strong policy favoring arbitration, but must also foster the adoption of standards which can be uniformly applied on an international scale."). This goal, Underwriters argue, can only be served by the adoption of "a uniform body of federal common law," and, they claim, the application of federal law to this case. (D.E. 27 at 8.)

As explained below, if the Court were required to choose whether federal or state law substantive principles should be applied to the interpretive question at hand, the Court would choose federal law in the context presented. There is substantial precedent, including teaching of the Supreme Court, which reflects that the underlying Congressional purpose in adopting and enacting the Convention was to provide for uniform federal standards applied through the federal courts. Moreover, the leading Seventh Circuit precedent concerning interpretation of arbitrator-designation time-limits, *Universal Reinsurance Corp. v. Allstate Ins. Co.*, 16 F.3d 125 (7th Cir. 1993), did not even hint at the idea that state law should be consulted concerning the application of a time limit by which to designate an arbitrator. *Id.* at 129 & n.1 (strictly applying time limit specified for in contract). As described below, however, whether applying federal law, or whether applying state law (which leads, through a choice of law analysis, to California law), Argonaut failed to timely appoint Mr. Thomson as an arbitrator. Neither the application of federal precedent nor the application of the California statute identified by Argonaut leads the Court to depart from the clear language of the Treaties requiring Argonaut to appoint an arbitrator within 30 days of receiving Underwriters' request.

11

A.    Federal Law

Although the Court does not, and need not, reach the conclusion that federal common law

should apply to the interpretation of the Treaties' arbitration clause, were it to assume, *arguendo*,

that federal law applies here, Seventh Circuit precedent strongly supports Underwriters' motion

for summary judgment. In *Universal Reinsurance Corp.*, 16 F.3d 125, a suit involving an

arbitration provision governing the selection of a three arbitrator panel substantially similar to

this one,[7] the Seventh Circuit refused to depart from the parties' written arbitration agreement

when one party was tardy in appointing the second arbitrator, thus resulting in the adverse party

choosing two arbitrators. *Id.* at 129. Although the arbitration provision at issue in *Universal*

*Reinsurance* required that Universal appoint the second arbitrator within 30 days of receiving a

notice to appoint an arbitrator, as a result of an inadvertent administrative oversight, Universal

failed to do so, resulting in Allstate choosing the second arbitrator. *Id.* The district court, which

had excused Universal of its failure to appoint the arbitrator as specified by the terms of the

arbitration agreement, had found that there was no bad faith or even gross negligence by

Universal. *Id.* at 129. The district court also had found that there was no meaningful prejudice

to Allstate as a result of Universal's failure to abide by the specified 30-day time provision. *See*

---

[7]    The arbitration clause at issue in *Universal Reinsurance Corp. v. Allstate Ins. Co.,* 16 F.3d 125, 126-127 (7th Cir. 1994), provided that:

> If any dispute arises between [the parties] with reference to the interpretation, performance or breach of this Agreement, (whether the dispute arises before or after termination of this Agreement) such dispute, upon written request of either party, will be submitted to three arbitrators, one to be chosen by each party and the third by the two chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may appoint both arbitrators.

*Id.*

*id.* at 127.

In explaining its decision to reverse the district court's grant of relief from the strict terms of the arbitration clause at issue, Judge Rovner, speaking for the Seventh Circuit, explained:

> It is tempting to relieve Universal of the consequences of its oversight. Its delay in naming an arbitrator was brief and inadvertent, and it caused no ostensible prejudice to Allstate. But the parties themselves have dictated the outcome in this situation, and absent compelling circumstances, it is not our province to rewrite their agreement.

*Id.* at 130. Judge Rovner emphasized that the written arbitration agreement, which called for appointment within 30 days, was "the best evidence of what the parties intended," and that the 30-day provision did "not command less deference simply because it concerns a procedural rather than a substantive aspect of the parties' decision to arbitrate." *Id.* at 129. She also explained that "the fact that the parties included a default provision for the selection of a second arbitrator after thirty days suggests to us that the parties considered the prompt appointment of the arbitrators quite important."

Like the Seventh Circuit in *Universal Reinsurance*, this Court might be tempted to relieve Argonaut of the effects of its seemingly inadvertent two-day delay in appointing Mr. Thomson as the second arbitrator. *Universal Reinsurance*, however, teaches that where parties have designated a time limit, that time limit controls. The time limit specified in the Treaties offers no hint that some or all Sundays or Holidays are excepted; sophisticated commercial parties certainly can (and sometimes do) make such provisions when they wish to provide for exceptions from what would otherwise appear to be facially applicable deadlines. *See, e.g.,* *Coastal States Trading, Inc. v. Zenith Navigation, S.A.*, 446 F.Supp. 330, 333 n.3 (S.D.N.Y. 1977) (quoting arbitration agreement which stated that the party had "twenty (20) days, excluding

13

Saturdays, Sundays and legal holidays to designate his arbitrator").

As Argonaut points out, the Court has no interest in requiring litigants and their attorneys to work on Sundays and holidays.[8] However, the Court does have an interest in following precedent, which in this case teaches that the Court is not to rewrite agreements negotiated in good faith between the parties thereto. *See Universal Reinsurance*, 16 F.3d at 129 ("it is not our province to rewrite their [*i.e.*, the parties'] agreement"). The arbitration agreement at issue here clearly says that the parties have 30 days to name an arbitrator after receiving a request to do so. (D.E 26 ¶ 9; D.E. 23-1 at 1.) Argonaut itself admits that the 30th day after August 6, 2004, was Sunday, September 5, 2004. (D.E. 26 ¶¶ 13-14.) Argonaut also admits that the plain language of the arbitration agreement does not make any accommodation for the fact that the 30 days specified therein might end on a weekend or a holiday (*id.*)—at least in America, although not in London, where Underwriters is located. Therefore, even if it were tempted to, the Court should not, under the teaching of *Universal Reinsurance*, "substitute [its] own notion of fairness in place of the explicit terms of . . . [the parties'] agreement. . . ." *Id.*, 16 F.3d at 130. *Accord, e.g.*,

---

[8] Of course, had Argonaut wished to avoid working on Sunday, it could have named an arbitrator on any of the 29 days prior to September 5, 2004. Recall that Argonaut triggered the entire arbitration process in the first place, on a date of its own initiative, and presumably could have named an arbitrator in connection with its initial demand but did not do so for whatever reason. It also could have designated an arbitrator at any point thereafter prior to September 5, 2004.

In addition, while Argonaut finds fault with Underwriters for failing to specify in their August 6, 2004 letter the date when the 30 days specified therein would run, Argonaut concedes that 30 calendar days after the demand was made, not even counting the day of the demand, was Sunday, September 5, 2004. (*See, e.g.*, D.E. 26 ¶¶ 13-14.) Furthermore, the Court finds Argonaut's arguments that Underwriters lacked "forthrightness" (D.E. 25 at 13) and "created ambiguity" (D.E. 30 at 8) by failing to explicitly specify that September 5, 2004 came 30 days after August 6, 2004 unpersuasive and, with all respect, most unfair to Underwriters in the *ad hominem* tone of these arguments. Again, Argonaut does not contend that it ever was unable to calculate when 30 calendar days ran (*i.e.*, on September 5, 2004—*see, e.g.*, D.E. 26 ¶¶ 13-14), and Underwriters did not do anything to obscure that fact or to suggest that it would not invoke its rights under the arbitration agreement so as to even arguably mislead Argonaut.

14

*Evanston Ins. Co. v. Gerling Global Reinsurance Corp.*, No. 90 C 3919, 1990 WL 141442, *2 (N.D. Ill. Sept. 24, 1990) (Holderman, J.) (holding, when a reinsurer missed a deadline to appoint an arbitrator by one day, that the other party could appoint two arbitrators and stating, "this court will not rewrite, but rather will enforce the agreement between the parties to this dispute") (collecting extensive federal caselaw); *City of Aurora, Colorado v. Classic Syndicate, Inc.*, 946 F.Supp. 601, 604 (N.D. Ill. 1996) (holding that "[w]here arbitration agreements contain specific time limitations, courts will adhere strictly to those time limitations absent a compelling reason to do otherwise," and allowing policyholder to appoint two arbitrators where the insurer missed the deadline in the agreement by one day) (citing *Universal Reinsurers*, 16 F.3d at 127); *Continental Cas. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, No. 03 C 1441, 2004 WL 725469, *3 (N.D. Ill. Mar. 30, 2004) (Der-Yeghiayan, J.) (explaining that "the law in the Seventh Circuit is clear" and refusing to excuse a failure to strictly perform under an arbitrator-appointment provision nearly identical to the one at issue here).

Argonaut attempts to distinguish this substantial body of caselaw by asserting that none of the cases cited above contemplated the situation here—where the 30th day fell on a Sunday followed by a holiday. While this is true, it is inapposite. The decisions above all teach that courts should avoid rewriting the terms of an arbitration clause to allow one party additional time to name an arbitrator. The same reasoning is instructive whether that party missed the deadline to appoint an arbitrator because of a clerical error (as in *Underwriters Reinsurers*) or because of the mistaken contention that the party was not required to work on Sundays or holidays and/or the simple oversight of failing to appoint an arbitrator in a timely manner. The same reasoning is applicable.

15

In this regard, the Treaties explicitly state that the parties have 30 days to appoint an arbitrator after receiving notice to do so. (D.E. 26 ¶ 9.) The Treaties also explicitly state that if a party fails to appoint an arbitrator in 30 days, the other party may instead appoint that arbitrator. (*Id.*) Argonaut failed to appoint an arbitrator within thirty days of receiving Underwriter's request to do so. (*Id.*¶ 13.) Underwriters, therefore, in accordance with the agreement, timely appointed Mr. Lewis. While Argonaut may now wish that it had negotiated the arbitration clause to state that the 30 days would be extended if the 30th day fell on a weekend or an American holiday, it simply did not negotiate such a deal. In accordance with federal precedent, therefore, Argonaut is left with the contract it did negotiate, and that contract, by its terms, leads the Court to deny Argonaut's motion for summary judgment and grant Underwriters' motion.

B.    State law

As stated, Argonaut argues that state law applies to the question at hand. In connection with this argument, Argonaut argues at length about the Supreme Court's teaching over the last ten to twenty years—*see, e.g.*, *O'Melveny & Myers v. Federal Deposit Ins. Corp.*, 512 U.S. 79 (1994)—in which it cabined some of the more expansive language concerning federal common law that had appeared in at least some earlier Supreme Court cases.

The Court can readily acknowledge the fact that the Supreme Court has criticized the notion of any reflexive or knee-jerk invocation of federal common law without straying into any hazardous waters in the specific context of the instant case. Supreme Court precedent, including recent precedent, firmly recognizes that there are substantial federal interests in the context of international relations that can justify the application of a uniform federal rule, as opposed to the direct application or application-by-incorporation-through-federal-common-law of disparate state

16

standards.[9] Thus, for example, *Atherton v. Federal Deposit Ins. Corp.*, 519 U.S. 213 (1997), teaches that, while the reach of federal common law is properly confined to "narrow areas," these areas paradigmatically include areas such as those concerned with "'interstate and international disputes implicating . . . relations with foreign nations.'" *Id.* at 226 (quoting *Texas Indust., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981), and collecting Supreme Court precedent). International commercial activity and disputes, of course, are a core aspect of international relations, as is reflected by the Supreme Court's quotation in *Scherck* of Congress's statements concerning the bases for the adoption of the Convention. *See Scherck*, 417 U.S. at 520 n.15 (citing, *inter alia*, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, S. Exec. Doc. E, 90th Cong., 2d Sess. (1968)).

It is clear that, under the Convention, "[a]n action or proceeding falling under the Convention *shall be deemed to arise under the laws and treaties of the United States.*" 9 U.S.C. § 203 (emphasis added). And, for what it is worth, if this Court were required to decide, the teaching of *Scherck* and other federal caselaw cited above concerning the desire for uniformity would lead this Court to conclude that the rule reflected in *Universal Reinsurers*—*i.e.*, "thirty days" should be strictly enforced, such that it means thirty calendar days—would govern as a matter of uniform federal law. The Court believes this result is the most faithful to the corpus of

---

[9]  "Federal common law" discussions often are murky because of the possibility that the applicable federal common law rule is to incorporate whatever state rule might apply, and thus substantive state law is applied and controls as a matter of "federal common law." *See, e.g., United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979); *see also* Hart and Wechsler's The Federal Courts and The Federal System, at 700-701 (5th ed. 2003). In this case, the briefing largely assumes that if a state rule applies, it cannot be called "federal common law," and that if federal law applies, Reinsurers will prevail on the authority of *Universal Resinsurance Corp. v. Allstate Ins. Co.*, 16 F.3d 125 (7th Cir. 1994). This opinion largely accepts the issue as framed by the parties' briefing, with the discussion above included for the sake of completeness.

17

applicable precedent discussed at length above.

The result also is more attractive than the suggested alternative—*i.e.*, that some State's (or, presumably, other Nation's or province's) local standard (as to be determined after an near-inevitable choice of law fight) should control. In this alternative, there will virtually always be a substantial chance of an in-court choice-of-law fight, particularly given the open-ended nature of standards used to analyze such questions. Moreover, the excision of holidays and "Sundays" (more on this later) from the 30-day terminus will invite otherwise unnecessary *ex ante* search costs for parties seeking to comply and will foster more, otherwise unnecessary, debates and questions. For example, it is only a fortuity in this case that the putative excluded holiday, September 6, 2004, is a national holiday—at least in the United States (where it was designated as Labor Day), although not in the United Kingdom, where it was simply Monday, September 6, 2004. Many holidays are recognized by one or more state or local governments, but not national governments, and whether various governmental offices or businesses get the relevant day "off" varies tremendously. In this vein, to take just the two states Argonaut offers as potential state-law sources in the instant dispute, California and Illinois, Illinois recognizes as holidays Abraham Lincoln's birthday (February 12th) and Casimir Pulaski's birthday (observed the first Monday in March);[10] the State of California recognizes neither such day as a holiday. California, however, does recognize as holidays the date it was admitted to the Nation as a State (September 9th) and Cesar Chavez Day (March 31st);[11] Illinois recognizes neither of these days as holidays.

---

[10]   *See* 205 ILCS 630/17(a).

[11]   *See* West's Ann. Cal. Gov. Code § 6700(f), (j).

18

None of these four days is a national holiday.[12] The parties offer no reason to think that this dynamic is confined to the United States—such that there are not provincial holidays unique to Quebec or other provinces or other sub-national units in other countries. In fact, it appears clear that there are even municipal-specific holidays observed in many international commercial centers. Thus, to take the cities of just one country, June 24th is a local holiday in Florence, Italy (where it is celebrated as St. John's Day); June 29th is a local holiday in Rome (where it is celebrated as St. Peter and St. Paul's Day); September 19th is a local holiday in Naples (where it is celebrated as St. Gennaro's Day); and December 7th is a local holiday in Milan (where it is celebrated as St. Ambrogio's Day).[13]

Similar problems attend to the idea of excising "Sundays." Sunday may seem like a logical candidate in this particular case, where the relevant parties are from the United States and Great Britain, two countries that historically and presently have substantial numbers of Christian residents. But the situation, of course, would be different if one of the parties were in Riyadh, Saudi Arabia (where the working week is Saturday to Wednesday, and sometimes part of

---

[12]  *See* 5 U.S.C. 6103(a).

[13]  *See* http://www.foia.state.gov/phonebook/holidays/holidays_details.asp?ID=Italy (Website of the U.S. Department of State, Foreign Service Post Information, FOIA listing concerning local holidays in Italy) (last visited August 8, 2006). Moreover, a review of this website, just for the nations of Japan (http://www.foia.state.gov/phonebook/holidays/holidays_details.asp?ID=japan) and India (http://www.foia.state.gov/phonebook/holidays/holidays_details.asp?ID=india), two substantial international economic powers, reveals that there is similar variation of local holidays in those countries too.

19

Thursday[14]), or Egypt or Israel (where the working week is Sunday through Thursday).[15] It is almost trite to acknowledge that the world is getting smaller and that the world's economics are increasingly interwoven, but in the context at hand, courts by definition will be dealing with an international commercial transaction, so these sorts of potential conflicts necessarily will be commonplace.

Argonaut offers no rule to govern this expansive series of permutations: must a holiday be a "holiday" in both affected countries? (Presumably not, or Argonaut loses here.) Do state, provincial or local holidays count? Do "weekend" days generally count? (If so, a transaction involving parties in New York and Saudi Arabia presumably only have to designate arbitrators on Monday, Tuesday or Wednesday, as all the other days of the week are excluded.) Do only days tied to common religious dates of observance count—such that, for example, only "Sundays" in America count (notwithstanding the enormous diversity of religious adherents in our country), and only Fridays in Egypt are carved out of the 30-day calculation? *See generally Swiss Bank Corp. v. Dresser Indust., Inc.*, 141 F.3d 689, 693-94 (7th Cir. 1998) (discussing the substantial variation in holidays around the world, and refusing to read a deferment into a contractual performance clause under Delaware law where the last date of performance was Good Friday).

With all respect to Argonaut, it never attempts to address these sorts of problems. The

---

[14] *See, e.g.*, http://www.saudinf.com (Website of the Saudi Arabian Ministry of Culture and Information; section discussing "Business Hours") (last visited August 8, 2006).

[15] *See, e.g.*, http://www.amcham.co.il (Website of the Israel-America Chamber of Commerce, section entitled "Business in Israel; Facts about Israel; Business Hours") (last visited August 8, 2006); http://www.amcham.org.eg (Website of the American Chamber of Commerce in Egypt, section entitled "Labor Regulations, Working Hours") (last visited August 8, 2006).

20

idea of embarking into such a morass is hardly attractive, particularly when such a clear alternative is readily available and easily administered—*i.e.*, "thirty days" presumptively means "thirty calendar days," unless the parties choose to excise days by agreement or secure extensions beforehand. Thus, there are substantial (and in this Court's view, persuasive) reasons in this international commercial context to reject the idea of attempting to find the applicable state standard among the fifty state standards available. A single, uniform federal rule offers a better option and is justifiable in the context at hand. *See Atherton*, 519 U.S. at 226.

Nonetheless, the Court need not definitively pass on this issue because, even if state law applies, the relevant law is the State of California. Under it, Argonaut also loses, as explained below.

        1.    Choice of law

The parties suggest only California and Illinois as potential sources of state law; no one suggests that English law might apply. The Court takes the options as framed by the parties.

The parties, with all respect, devote little meaningful analysis to the choice of law issues. Precedent teaches that it is at least arguably an open question as to whether Illinois or federal common law choice of principles apply to choose the applicable law—*see, e.g., Fed. Deposit Ins. Corp. v. Wabick*, 335 F.3d 620, 625 (7th Cir. 2003) (discussing circuit split)—although the Seventh Circuit at least arguably has directed that federal common law choice-of-law principles govern this gating question to any underlying state law standards. *See id.* & n.2 (discussing *Resolution Trust Corp. v. Chapman*, 29 F.3d 1120, 1124 (7th Cir. 1994)). The Court need not resolve this issue either: federal common law choice-of-law principles and the choice-of-law principles of the forum state (here, Illinois) both lead to California law.

For contracts, Illinois applies the most significant contacts (Restatement) analysis for making a choice of law determination. *See, e.g., Curran v. Kwon*, 153 F.3d 481, 488 (7th Cir. 1998). These principles require courts to "consider the place of contracting, the place of the negotiation of the contract, the place of performance, the location of the subject matter of the contract and the domicile and nationality of the parties." *Id.* The weighting of these factors will vary depending on the particular issues at stake in the litigation. *Id.* Under Illinois law, the factors to consider in determining choice of law for an insurance policy are quite similar and include "the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (1995) (internal citation omitted). Federal choice of law principles also reflect those set forth in the Restatement—*see Berger v. AXA Network, LLC*, 370 F. Supp. 2d 751, 753 (N.D. Ill. 2005) (citing *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 926 F. Supp. 736, 739 (N.D. Ill. 1996))—so the operative guideposts are the same either way.

As explained, the parties' choice of law discussion is charitably described as terse. The only information provided by the parties is as follows: (1) Argonaut is a California corporation with its principal place of business in California (D.E. 25-2 at 4); (2) Underwriters include citizens of the United Kingdom (D.E. 1 ¶ 1); (3) at least some of the attorneys for both parties are in Illinois (D.E. 25-2 at 4); (4) the underlying coverage lawsuit forming the basis for Argonaut's reinsurance claim was filed in California (*Id.*); and, (5) according to Underwriters, "Illinois has absolutely no relationship to the formation of the reinsurance contracts between the parties or the

22

arbitration provisions included therein." (D.E. 27 at 11, n.9.)

The weight of these factors points to California. To the extent that the "subject matter" is Argonaut's coverage for the California lawsuit, this factor favors California or arguably is a non-factor, as the subject matter at least arguably is a worldwide contingent financial commitment to reimburse for covered losses. The parties provided no information as to "place of contracting," although the reinsurance policies provided to the Court indicate several times that they were signed for Underwriters in London. (D.E. 21-2, Ex. C.) As to the place of negotiation, the policies provided list Argonaut's address in Menlo Park, California. (*Id.*) Therefore, without further information on the matter—for example, the location of a broker and/or the principal individuals involved in the negotiation—the Court can only conclude that negotiation took place between representatives of Argonaut in California and representatives of Underwriters in London. Therefore, the only information available to the Court indicates that both the place of contracting and the place of negotiation were either London or California. The place of performance and location of subject matter are unknown, with no information indicating that either would favor Illinois. The parties are domiciled in California and London. In addition, at least one of the arbitration provisions at issue here indicates that any arbitration thereunder is to take place in California. (D.E. 21-2, Ex. C.) Since no one has suggested that British law applies to this case, and instead only California and Illinois have been presented as options, the Court finds that, if state law were to apply to this matter, the applicable law would be that of California and not of Illinois.[16] There are many meaningful contacts with California, and few, if any, with

---

[16] Argonaut notes that Reinsurers do not dispute that venue is appropriate in this district. (D.E. 30 at 6.) However, a finding that venue is appropriate is not equivalent to a concession that the choice of law analysis leads to the law of the forum court. Otherwise, every choice of law analysis would conclude

23

Illinois.

### 2. California law

Argonaut contends that, by operation of California law, it had 32 days from receiving a request to appoint an arbitrator in which to appoint Mr. Thomson, rather than the 30 days articulated in the Treaties' arbitration clauses. (D.E. 25-2 at 4-5.) This is so, Argonaut claims, because California Civil Code § 11 excused it from performance on September 5, 2004, a Sunday, or September 6, 2004, a holiday in California. (*Id.*) The Court respectfully disagrees with Argonaut's reading of California Civil Code § 11.

California Civil Code § 11 provides that "[w]henever any act of a secular nature, other than a work of necessity or mercy, is appointed by law or contract to be performed on a particular day, which day falls upon a holiday, it may be performed upon the next business day, with the same effect as if it had been performed on the day appointed." Cal. Civ. Code § 11. Holidays are proscribed by California Civil Code § 7 as "every Sunday and such other days as are specified or provided for as holidays in the Government Code of the State of California." Cal. Civ. Code § 7.[17] If the arbitration clause here required that Argonaut appoint an arbitrator on the 30th day after receiving a request to do so, Argonaut might be correct that California Civil Code § 11 would have relieved it of its obligation to act on the 30th day, September 5, 2004. However, the arbitration provision specifically states that each party must name an arbitrator "*within* thirty days" of the other party's written request to do so. (D.E. 26 ¶ 9) (emphasis added).) California

---

that the law of the forum applied, which is obviously not the case.

[17]  California Government Code § 6700(i) makes the "first Monday in September," which September 6, 2004 was, a holiday. Cal. Gov. Code § 6700(i).

24

Civil Code § 11 does not state that it is applicable when an act is to be performed within a span of days, but rather, it states that it applies when an act is "to be performed upon a *particular* day." Cal. Civ. Code § 11 (emphasis added). Therefore, because Argonaut was not required to appoint an arbitrator either particularly on Sunday September 5, 2004 or Monday September 4, 2004, but instead within 30 days of August 6, 2004, its failure to do so by September 5, 2004, the 30th day, is not excused by California Civil Code § 11 as it relates to contracts.[18]

## C. Section 206 of the Convention

Finally, Argonaut argues that even if its failure to appoint an arbitrator by September 5, 2004 was untimely under the Convention, Section 206 of the Convention allows this Court to exercise discretion in enforcing the Treaties' arbitrator-appointment provision. (D.E. 25-2 at 10-13.) Section 206 provides that a court "may [] appoint arbitrators in accordance with the provisions of the agreement." 9 U.S.C. § 206. In contrast, the FAA provides that the method of selecting an arbitrator "shall be followed." 9 U.S.C. § 5. Argonaut argues that the inclusion of the word "may" in Section 206 allows courts discretion in choosing whether to enforce the

---

[18] The parties did not cite any cases otherwise interpreting California Civil Code § 11, nor has the Court's research revealed any. In addition, although Argonaut did not argue that California Civil Code § 10 should apply to excuse its nonperformance on September 5, 2004, that section appears equally inapplicable. California Civil Code § 10 states:

> The time in which any act is to be provided by law is to be done is computed by excluding the first day and including the last, unless the last day is a holiday, and then it is also excluded.

Cal Civ. Code § 10. Unlike California Civil Code § 11, however, § 10 does not specify that it is applicable to contracts. Therefore, as the terms "or contract" were included in California Civil Code § 11, but not in section 10, California Civil Code § 10 is inapplicable to the dispute over contract interpretation at issue here. *See Gans v. Smull*, 111 Cal.App.4th 985, 990 (Cal. App. Ct. 2003) (holding that a statute not explicitly applicable to contracts was not so applicable and stating that "[w]here the Legislature uses particular language in a statute, the omission of such language in a similar statute tends to show a different legislative intent").

25

arbitrator-appointment provisions in arbitration agreements subject to the Convention. (D.E. 25-2 at 10-13.) Underwriters disagree that Section 206 of the Convention confers any such discretion. The Court need not resolve the question of whether it would have discretion to relieve Argonaut of the consequences of its failure to timely designate an arbitrator, because the Court would not exercise such discretion in any event.

In reaching this conclusion, it is worth highlighting that this case involves extraordinarily sophisticated commercial parties who fairly can be expected to abide by deadlines of their own creation. It is difficult to avoid the conclusion that litigants like these routinely enter into arbitration agreements of the sort at issue, and routinely pick from an in-house list of acceptable and competent arbitrators to adjudicate disputes. In addition, the Court is mindful of the Seventh Circuit's teaching in *Universal Reinsurance* that courts should address arbitrator-appointment disputes in a way that will tend to diminish the number of "needless skirmishes and delays" concerning the selection of arbitrators. *Id.* at 130. Otherwise, courts lure parties "to the very expenditure of time and money in the courtroom" that arbitration is intended to avoid. *Id.*

The Court need not rule that no set of circumstances conceivably could warrant an exemption (assuming such discretion exists under Section 206 of the Convention)—one can posit hypotheticals involving unforeseeable natural disasters or similar catastrophes that might justify such relief. But the instant case involves literally the most tepid of mitigating circumstances, if any at all. At most, it appears that a letter should have been mailed but was not, or perhaps was not written at all. The oversight occurs in the context of an arbitral process that Argonaut initiated at a time of its own choosing, and by a communication that, for whatever reason, did not appoint a designated arbitrator at the threshold of the proceedings or immediately upon

26

Reinsurers' demand to do so. If this case warranted an exemption (assuming, again, that there is authority to provide one), the presumptive deadline would mean little.[19] Short of willful disobedience, virtually any case could likely be framed to fit within the boundaries of this one. *See generally Evanston Ins. Co.*, 1990 WL 141442 at *2 (rejecting, in case involving arbitrator-appointment dispute litigated under the FAA, invitation to exercise "equitable discretion" so as to excuse untimely appointment).[20] If the Court has discretion, it respectfully declines to exercise it.

## CONCLUSION

The Court takes no pleasure in holding Argonaut to the consequences of its assumedly inadvertent mistake. However, Argonaut offers no warrant to excuse it from its failure. For the reasons stated above, Underwriters' motion for summary judgment is granted and Harry

---

[19] In its reply brief, Argonaut for the first time references the "general rule of law stating that ambiguities should be construed against the drafter." (D.E. 30 at 8.) This argument is not compelling for at least two reasons. First, it was raised the first time in a reply brief, which is procedurally unacceptable. *See, e.g., Porco v. Trustees of Indiana Univ.*, 453 F.3d 390, 395 (7th Cir. 2006). (The argument was also only raised in passing, which may well independently be another fatal deficiency.) Second, and independently, there is nothing ambiguous about the "30 day" clause at issue. Argonaut does not contend that it cannot now, and could not during the course of the operative events, calculate the thirty day calendar period, nor does it contend that it provided notice of an appointed arbitrator within 30 calendar days.

[20] The Court appreciates Argonaut's contention that Section 206 of the Convention says "may" and the FAA says "shall," as discussed further above. Nonetheless, in *Evanston Ins. Co. v. Gerling Global Reinsurance Corp.*, No. 90 C 3919, 1990 WL 141442 (N.D. Ill. Sept. 24, 1990), Judge Holderman was presented with caselaw from the Southern District of New York holding that, even in the context of the FAA, a court may exercise discretion so as to excuse a party from a failure to timely appoint an arbitrator. *See id.* at *2 (citing *Compania Portorafti Commerciale, S.A. v. Kaiser Int'l Corp.*, 616 F. Supp. 236 (S.D.N.Y. 1985)). Judge Holderman rejected the invitation to excuse the untimely party, stating that courts must "'rigorously enforce agreements to arbitrate,'" and that, "given this federal mandate, this court will not rewrite, but rather will enforce the agreement between the parties to this dispute." *Id.* (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). Nothing about Judge Holderman's analysis turned on the "may" vs. "shall" issue, and his ruling predated the Seventh Circuit's holding in *Reinsurance Corp. v. Allstate Ins. Co.*, 16 F.3d 125 (7th Cir. 1994), so he was not simply applying the holding of that precedent.

Hinkleman and Stephen Lewis are confirmed as arbitrators in this matter. (D.E. 19.) Argonaut's motion for summary judgment is respectfully denied. (D.E. 25.) Underwriters' motion to strike Argonaut's affirmative defense (D.E. 14) is stricken as moot.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: _8 - 8 - 06_